## IN THE UNITED STATES DISCRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DESTINY KENNEDY, On behalf of herself and all other Georgia citizens similarly situated,<br><br>    **Plaintiff,**<br><br>**v.**<br><br>VGW HOLDINGS LIMITED, VGW MALTA LIMITED, VGW LUCKYLAND INC., and VGW GP LIMITED,VGW HOLDINGS US INC., VGW US INC.<br><br>    **Defendants.** | )<br>)<br>)<br>)  **COMPLAINT –C LASS**<br>)  **ACTION**<br>)<br>)   **CIVIL ACTION**<br>)   **1:24-cv-02184-TWT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____/

## <u>AMENDED COMPLAINT</u>

Plaintiff DESTINY KENNEDY brings this action and sues Defendants VGW

HOLDINGS LIMITED, that has an address of L 11, Australia Place, 15-17

William Street Perth, Western Australia 6000 Australia, including its subsidiaries

VGW MALTA LIMITED, with an address of 5-7 Matilda Court, Giuseppe Cali

Street, Ta'Xbiex, XBX 1423 Malta, VGW LUCKYLAND INC., a Delaware

Corporation with an address Care of Paracorp Incorporated, 2140 S. DuPont Hwy.,

Camden. Delaware 19934, VGW GP LIMITED that has an address of Trident

Park, Notabile Gardens No6, Level 3 Central Business District, Mdina Road, Zone 2, BIRKIRKARA, Malta, VGW HOLDINGS US INC. with an address Care of Paracorp Incorporated, 2140 S. DuPont Hwy., Camden Delaware 19934, and VGW US INC. with an address of Care of Paracorp Incorporated, 2140 S. DuPont Hwy., Camden Delaware 19934.

## PARTIES JURISDICTION AND VENUE

1.      The Georgia courts have jurisdiction over the subject matter of this action because the Georgia courts are courts of general jurisdiction and the damages sought by Plaintiff and on behalf of a group of Georgia citizens (hereafter referred to as the "Class") exceed $50,000, the necessary jurisdictional threshold.

2.      VGW HOLDINGS LIMITED is an Australian company that – according to its audited financial statements filed with the Australian Securities & Investments Commission – fully controls and operates its subsidiary companies, VGW MALTA LIMITED, VGW LUCKYLAND INC., VGW GP LIMITED, VGW HOLDINGS US INC., and VGW US INC.  VGW HOLDINGS LIMITED operates an internet website "vgwplay.com" that links to its subsidiary companies' internet casino gambling operations.

3.      VGW HOLDINGS LIMITED, along with its subsidiary companies, actively operate and market internet gambling websites within the State of Georgia and

Fulton County, which websites and operations are unpermitted and illegal under Georgia law.

4.    VGW LUCKYLAND INC. is a Delaware corporation, which maintains an office in San Francisco California. VGW LUCKYLAND INC. conducts business throughout Fulton County and the State of Georgia.

5.    VGW MALTA LIMITED is a company formed in the Island of Malta that maintains offices in Australia. VGW MALTA LIMITED conducts business throughout Fulton County, and the State of Georgia.

6.    VGW GP LIMITED is a company formed in the Island of Malta. VGW GP LIMITED conducts business throughout Fulton County, and the State of Georgia.

7.    This court has personal jurisdiction over VGW HOLDINGS LIMITED, including its subsidiaries VGW MALTA LIMITED, VGW LUCKYLAND INC., VGW GP LIMITED, VGW HOLDINGS US INC., and VGW US INC. pursuant to O.C.G.A. § 9-10-91(1) – (3) because these defendants continually conduct business within the boundaries of the State of Georgia, attempt to contract to supply goods and services into Georgia, and have tortiously injured Georgia citizens by wrongly taking millions of dollars from Georgia citizens through illegal gambling operations that take place in Georgia.

8.    VGW HOLDINGS LIMITED, the parent company of VGW MALTA LIMITED, VGW LUCKYLAND INC., VGW GP LIMITED, VGW HOLDINGS

US INC., and VGW US INC., actively controls and actively operates these subsidiaries and exercises sufficient control over the subsidiaries to render VGW MALTA LIMITED, VGW LUCKYLAND INC., VGW GP LIMITED, VGW HOLDINGS US INC., and VGW US INC. as agents or alter egos of VGW HOLDINGS LIMITED.

9.    Hereafter, VGW HOLDINGS LIMITED is referred to as "VGW HOLDINGS.."  VGW MALTA LIMITED is referred to as "VGW MALTA,," VGW LUCKYLAND INC., is referred to as "VGW LUCKYLAND" and VGW GP LIMITED is referred to as "VGW GP.."  Throughout this Amended Complaint (hereafter referred to as "the Complaint") when Plaintiff refers to VGW HOLDINGS, VGW MALTA, VGW LUCKYLAND, VGW GP, VGW HOLDINGS US INC., and VGW US INC., collectively, Plaintiff refers to these combined Defendants acting in concert as "VGW.."

10.    Venue is proper in Fulton County pursuant to O.C.G.A. § 9-10-93, and Georgia law because Plaintiff resides in Fulton County, a substantial part of the events giving rise to the claims asserted herein occurred in Fulton County, and because VGW committed acts that are the basis for this lawsuit proceeding in this county.

11.    VGW actively promotes and operates internet gambling websites that target citizens of the State of Georgia ( Georgia citizens) and conducts business within the State of Georgia and Fulton County.

12.    Plaintiff is a natural person and citizen of the state of Georgia who has resided in Fulton County, Georgia at all times material to this Complaint.

13.    Between September 27, 2023, and December 3, 2023, Plaintiff registered and entered into internet casino websites operated by VGW MALTA, VGW LUCKYLAND, and VGW GP, which are owned and controlled by VGW HOLDINGS.  During that period Plaintiff lost approximately $1,150, playing the casino games of chance that are promoted and operated by VGW on these internet websites ($500 on Chumba, September 7 and 12, 2023; $449.95 on Luckyland, September 12, 2023; $200 on Global Poker, December 3, 2023).

14.    Plaintiff is authorized to bring this action because Plaintiff was damaged by the illegal gambling operations conducted by VGW, and because Plaintiff has not agreed to any form of arbitration or alternative dispute resolution.  This is because Plaintiff timely "opted out" of any obligations to participate in arbitration or alternate dispute resolution, in accordance with the Terms of Service contained in VGW's websites,  August 27, 2023 (Chumba and Luckyland), reaffirmed November 20, 2023, and November 29, 2023 (Global Poker),.  Copies of

Plaintiff's notices are attached as Composite Exhibit "A" and incorporated as part of this Complaint by reference.

15.    Plaintiff is also authorized to bring this action on behalf of other similarly situated Georgia citizens who have gambled on VGW websites.

16.    VGW actively promotes and operates internet gambling websites that target citizens of the State of Georgia or Georgia citizens and the actions of VGW constitute conducting business within the state of Georgia and Fulton County.

**FURTHER ALLEGATIONS SUPPORTING**

**PERSONAL JURISDICTION OVER VGW**

17.    Defendants VGW LUCKYLAND, VGW HOLDINGS US INC., and VGW US INC. are Delaware Corporations.  Therefore, VGW LUCKYLAND, VGW HOLDINGS US INC., and VGW US INC are subject to the jurisdiction of the courts in the United States.

18.    Further, VGW LUCKYLAND has office operations in California, Ohio, and New Hampshire.

19.    VGW MALTA maintains its United States headquarters as a post office box in Portsmouth, New Hampshire and records show that it maintains an office in Boulder, Colorado at 1881 9th Street, Suite 202.

20.    Records further show that VGW GP maintains United States operations for Global Poker at 1881 9th Street, Suite 202, Boulder Colorado and VGW US INC also appears to maintain an office or operations at that address.

21.    All VGW games are required to be played within the boundaries of the United States and Canada.

22.    All United States players of VGW games are required to make transfers or payments from charges on credit cards, debit cards, digital wallets, and gift cards from within the United States.

23.    Whenever a United States citizen attempts to collect winnings of money from playing VGW's gambling games, all VGW games mandate that prizes, or money paid to players must be paid to a bank, digital wallet, or gift card within the United States.

24.    All VGW's websites seek to invoke the privileges afforded to United States' companies, such as attempts to invoke arbitration under the Federal Arbitration Act.

25.    VGW also affirmatively seeks the protections of United States law by attempting to place in its Terms of Service / Terms and Conditions (hereafter "Terms of Service") forum selection clauses and choice of law provisions.

26.    Specifically, VGW declares in its Terms of Service that it believes Delaware law should be the accepted law within the United States.

27.    By its own actions, VGW has stipulated to personal jurisdiction in several cases within the United States, including the state courts of Massachusetts, and federal district courts in Alabama, and Tennessee.

28.    VGW has affirmatively alleged in a variety of lawsuits that it is protected under the federal Class Action Fairness Act by stating, under oath, that thousands of United States citizens have played its website gambling games in the State of Georgia and in Alabama, Florida, Mississippi, Massachusetts, and Tennessee.

29.    VGW has affirmatively claimed in its Terms of Service and posted on its websites that its companies are operating legally within all states of the United States, except for Washington, Idaho, Montana, Michigan, Connecticut, and also Nevada by April 15, 2025.

30.    VGW likewise operates several United States shell companies, including VGW US INC and VGW HOLDINGS US INC.

31.    VGW advertises its websites extensively in the United States through various forms of mass communication while spending millions of dollars on advertising with several United States sports and entertainment celebrities as its spokespersons, including Olympic champion swimmer, Michael Phelps, and "American Idol" and daily, national television talk show host, Ryan Seacrest.

32.    VGW has likewise advertised on the internet for the services of United States citizens to become employees of VGW's subsidiary companies.

33.    VGW's websites are highly interactive in all ways.  They are used simultaneously for commercial transactions – in the form of depositing funds, wagering/gambling, and redeeming funds – and also for exchanging information with VGW's host computers and servers in the form of playing casino games. VGW's websites are built entirely upon high levels of interactivity and are not passive in any way in terms of contact with the United States and its citizens.

34.    Therefore, it is clear that VGW and all of its companies listed as defendants in this Complaint are subject to the personal jurisdiction of the courts of the United States.

## PERSONAL JURISDICTION AND VENUE

## STATE OF GEORGIA

35.    Under Georgia law and the requirements of due process, VGW has sufficient contacts with the State of Georgia for purposes of the constitutional exercise of personal jurisdiction over VGW by the Georgia courts.

36.    VGW actively promotes and operates internet gambling websites that target Plaintiff and other Georgia citizens and the actions of VGW constitute conducting business within the State of Georgia and Hinds County.

37.    Plaintiff and other Georgia citizens are frequently intentionally targeted by advertisements for VGW's websites on platforms such as X/Twitter and Facebook.

38.    In fact, VGW has engaged in and continues to engage in targeted advertising to, and negotiations with, individual Georgia citizens.   If Plaintiff or other Georgia citizens enter internet searches for the words, "Chumba," "Luckyland," "Global Poker" on internet search engines and social media websites, the algorithms utilized by VGW through internet platforms such as Google, Facebook, Instagram, X/Twitter, and others, identify the Georgia citizens and then broadcasts targeted internet advertisements for VGW back to Plaintiff and other similar Georgia citizens.

39.    Based on good faith and belief, VGW has  systematically and continually advertised the Chumba gambling site in the Atlanta Journal Constitution (AJC), a digital newspaper.  These advertisements are specifically intended to reach, be read by, and entice citizens of Georgia to gamble at a VGW website.  On good faith and belief Plaintiff alleges that the AJC had roughly 50,000 subscribers in 2021. However, as of October 2023, the AJC, has been looking to expand its digital service to over 500,000 subscribers by 2026.

40.    These retargeted advertising efforts and direct AJC advertising efforts  are employed by VGW to intentionally advertise to, entice, and negotiate with Plaintiff and other Georgia citizens.  The purpose of VGW's retargeted advertising is to lure Plaintiff and other Georgia citizens to gamble on VGW's websites.

41.    The retargeted advertising and the AJC direct advertising are  specific to Plaintiff and other Georgia citizens because VGW takes significant effort to ensure that it is targeting its advertising to citizens who VGW believes are citizens in only those states where VGW wrongly claims it is entitled to operate.

42.    Once Plaintiff and other Georgia citizens decide to access VGW's websites, VGW ensures that Plaintiff and other Georgia citizens who gamble on the websites are not doing so within those state jurisdictions where VGW now acknowledges it is prohibited from operating.  As an example, the depictions below show messages received when a Georgia citizen attempts to access VGW from a region where VGW acknowledges it is prohibited to operate.







43.    To make sure that Plaintiff and other Georgia citizens are gambling on VGW's websites within the boundaries of the State of Georgia, VGW verifies that the Plaintiff and other Georgia citizens register with internet protocol addresses that are geographically assigned to Georgia.

44.    Further, according to the VGW Terms of Service, Plaintiff and other Georgia citizens are required to prove that they are citizens of Georgia by producing their drivers' licenses and verifying their Georgia addresses.

45.    VGW verifies that Plaintiff and other Georgia citizens are registering and playing in the State of Georgia in multiple ways.  VGW confirms the internet protocol addresses of Plaintiff and other Georgia citizens to ensure that they are the players or wagerers located in Georgia.  VGW asks for proof of address and identity from Plaintiff and other Georgia citizens when verifying Plaintiff's and other Georgia citizens' accounts on the VGW websites.  VGW verifies Plaintiff's and the other Georgia citizens' bank accounts to process redemptions.  VGW confirms that the address registered to the bank account matches the Plaintiff and other Georgia citizens' addresses provided to VGW.  And the bank accounts, which for all practical purposes, are most likely located in Georgia are the only bank accounts VGW will accept for processing of payments or redemptions to Plaintiff and the other Georgia citizens.

46.    After Plaintiff and other Georgia citizens confirm for VGW that they are going to play VGW's games within the State of Georgia or only those areas where VGW claims it can legally operate, VGW continually monitors the internet protocol addresses of Georgia citizens as they are playing VGW's games.  This is to ensure that Plaintiff and other Georgia citizens are conducting the game play, and all activity associated with the websites from within the boundaries of Georgia or in locations where VGW has not been formally prohibited.

47.    Through these steps VGW is operating in the same manner that any brick-and-mortar casino on the ground in another state would operate.  The only differences are that VGW may not have a building located on the ground in Georgia where Plaintiff or other Georgia citizens may sit down to gamble and that VGW is not operating legally within Georgia.

48.    VGW's Terms of Service state, "3.2 Gold Coin purchases made from within the states of Washington, Michigan, Montana, Connecticut and Nevada in the United States of America will be voided."   Therefore, for all practical purposes transfers and payments are made to and from bank accounts within the State of Georgia.  Plaintiff and the vast majority of Georgia citizens playing VGW's games make payments to gamble just as if they are standing at a casino cage or casino table  in Las Vegas, Nevada.

49.     In nearly all circumstances, whenever Plaintiff and other Georgia citizens attempt to collect winnings of money from gambling on VGW's casino games, all VGW games mandate that prizes, or money paid to Plaintiff and other Georgia citizens must be paid to a bank associated with Plaintiff and other Georgia citizens' address and identifying information.  For all practical purposes this means the vast majority of VGW's financial transactions with Plaintiff and other Georgia citizens occur within the geographical boundaries of the State of Georgia.  This is identical to Plaintiff and other Georgia citizens physically going to a casino cage to purchase chips, place bets, and collect gambling winnings.  The only difference is that the transactions are being done electronically over the internet.

50.     The interactivity with VGW's websites expands from digital communications to the physical world as well.  As a part of VGW's thinly veiled attempt to classify its illegal gambling operations as "sweepstakes" VGW offers Plaintiff and other Georgia citizens the opportunity to send handwritten letters to VGW through the United States mail to request "Sweeps Coins          ."  Plaintiff and other Georgia citizens can use the Sweeps Coins to gamble on VGW's websites and redeem them for actual currency.  All such letters must be sent from a physical location in Georgia.  Furthermore, if Plaintiff and other Georgia citizens, who registered an account with VGW, send letters from outside of Georgia, the letters will be automatically rejected by VGW.  This equates to VGW giving

Plaintiff and other Georgia citizens "comped" bets or free wagers, the same as may be done as if Plaintiff and the other Georgia citizens are present at a brick-and-mortar casino in another state. VGW offers this additional method of acquiring Sweeps Coins to misrepresent that VGW's games are a sweepstakes and simultaneously to induce Georgia citizens to also spend money to make wagers or bets. However, if someone from the blocked areas of Washington, Idaho, Montana, Michigan, Connecticut, or Nevada were to send these physical handwritten letters to VGW the letters would not be processed, and no Sweeps Coins would be issued. This is another example of VGW purposefully operating in the State of Georgia, promoting use of the United States Postal Service from Georgia and further expanding VGW's interactions with Plaintiff and other Georgia citizens through the online world to the physical realm.

51.    VGW's highly interactive websites maintain continual contact with Plaintiff and other Georgia citizens. When Plaintiff and other Georgia citizens are allowed to play the casino games and gamble on VGW's websites, Plaintiff and other Georgia citizens submit wagers and payments of money from Georgia through the internet to VGW's websites. In response VGW submits internet communications back into Georgia to Plaintiff and other Georgia citizens, in the form of video images of slot machines, scratch offs, and card tables like blackjack and poker. VGW sends animations of cards being dealt and slot machine wheels spinning that

notify Plaintiff and other Georgia citizens whether their wagers or bets have been successful.  These communications also reveal whether Plaintiff and other Georgia citizens have lost money and must continue making bets to attempt to recoup their losses or win additional money.  These continuous communications and wagering interactions back and forth between VGW and Plaintiff and other Georgia citizens constitute millions of transactions conducted in Georgia, which further establish jurisdiction over VGW.

52.    VGW acknowledges that it has conducted gambling transactions and purchases between at least 100 Georgia citizens and received at least $5,000,000 from the Georgia citizens through these website transactions.  In reality, the transactions and purchases are likely closer to a hundred million or more.

53.    VGW's contacts with the United States and Georgia are precisely the type of activity that establish the minimum contacts sufficient to assert personal jurisdiction over VGW in this case and satisfying the standards identified by the courts in these cases.  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010); *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames,* 620 S.E.2d 352 (2005); *See also, Skyhop Techs., Inc. v. Narra*, 58 F.4th 1211 (11th Cir. 2023); *American College Connection, Inc. v. Berkowitz,* 775 S.E. 2d. 226 (2015)*; Aero Toy Store, LLC v. Grieves 279 Ga. App. 515, 631 SE2d 734 (2006); Latium USA Trading, LLC v. Smith 899 S.E.2d 324 (2024).*

*Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 265 n.31 (5th Cir. 2024);

*Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th at 226 (5th Cir. 2022) (en

banc), *cert denied,* 143 S. Ct. 1021, 215 L. Ed. 2d 188 (2023); *see also Adams*, 364

F.3d at 651 (citing *World Tanker*, 99 F.3d at 723); *DISH Network, L.L.C. v.

Elahmad*, No. 23-20180, 2024 U.S. App. LEXIS 5729, 2024 WL 1008585, at *2

(5th Cir. Mar. 8, 2024) (per curiam) (unpublished). *Fitch v. Wine Express, Inc.,* 297

So.3d 224 (2020); *See also, Compuserve Inc. v. Patterson*, 89 F.3d 1257 (6th Cir.

1996); *Noco Co. v. Shenzhen Valuelink E-Commerce Co.,* 550 F.Supp.3d 488 (N.D.

Ohio 2021).

54.     In fact, VGW has recently expanded its interactive communications to

include video transmissions of live dealers where actual individuals deal hands of

blackjack and operate roulette wheels that reveal the results of the gamblers'

wagers, conveying the impression that a Georgia citizen is actually sitting in a

brick-and-mortar casino and gambling when the citizen is on VGW's websites.

Images supporting this contention are shown in paragraph 89 below.

55.     VGW's contacts with Plaintiff and other Georgia citizens meet or exceed the

minimum contacts recognized by the State of Georgia and the United States Courts

of Appeals for the Eleventh Circuit and Fifth Circuit for VGW to be subject to

personal jurisdiction within the State of Georgia, as has been found by the Eleventh

and Fifth Circuit Court of Appeals and other courts regarding similar activities in

these cases.  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010); *Revell v. Lidov,* 317 F.3d 467 (5th Cir. 2002); *SportsCastr Inc. v. Sportradar Grp.,* Civ. Act. No. 2:23-CV-00472-JRG, 2024 U.S. Dist. LEXIS 167277, 2024 WL 4219252 (E.D. Tex. Sept. 17, 2024) (non resident defendant placed sports betting video products in the 'stream of commerce' with the knowledge and intention they would be used in forum state - Texas); *Tate v. RCI, LLC,* 2018, Civ. Act. No. H-17-290, U.S. Dist. LEXIS 96598, 2018 WL 11673539 (S.D. Tex. June 8, 2018);  *Thompson v. Handa-Lopez, Inc.,* 998 F. Supp. 738 (W.D. Tex. 1998); *See, Churchill Downs, Inc. v. Trout,* 979 F. Supp. 2d 746 (W.D. Tex. 2013); Neogen *Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883 (6th Cir. 2002); *S.I.A. Limited, Inc. v. Wingate,* 677 S.W.3d 487 (Ky 2023); *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W. 3d 792 (Ky. 2020).

56.     VGW has purposefully availed itself of the privilege of conducting business within the State of Georgia.  VGW electronically tracks the geographic location of all visitors and wagerers by analyzing and checking the internet protocol address of all visitors and wagerers.  VGW purposefully chooses to operate within the State of Georgia by allowing Georgia citizens who are confirmed to have Georgia internet protocol addresses to access VGW's gambling websites.  This is because VGW blocks access to its websites from other geographic regions such as Washington, Idaho, Montana, Michigan, and Connecticut, states where VGW has been ordered

to cease and desist operating.  Therefore, VGW is intentionally and purposefully deciding to send its internet communications into the State of Georgia and receive internet communications back from Georgia citizens.

57.    VGW knows that it is violating Georgia's gambling laws and yet it intentionally and purposefully continues its illegal conduct within the State of Georgia causing damages to Georgia citizens who have incurred losses as a result of VGW's illegal gambling business.  Therefore, VGW is also subject to the jurisdiction of this Court and the courts of Georgia under O.C.G.A. § 9-10-91 (3) by committing tortious injury to Georgia citizens from VGW's acts outside of Georgia on a regular basis and through persistent course of conduct and VGW derives substantial revenue from the gambling operations in Georgia..

58.    The State of Georgia has an important public policy interest in adjudicating this case due to the brazen constant illegality VGW has demonstrated and therefore jurisdiction and venue of this Court and the courts of Georgia is appropriate.

59.    VGW attempts to escape the jurisdiction of this Court and the Georgia courts by including forum selection and choice of law clauses in VGW's Terms of Service.  However, these Terms of Service are illegal gambling contracts which are "void" according to O.C.G.A. § 13-8-3.  Even if any such clauses in these illegal Terms of Service are severed and analyzed by themselves, they are void and against Georgia's public policy.

60.     Therefore, the VGW Terms of Service and any allegedly severable clauses, including but not limited to arbitration agreements, forum selection, and choice of law clauses are "void," specifically contrary to Georgia public policy under O.C.G.A. § 13-8-2, and unenforceable. VGW is therefore subject to the jurisdiction of this Court.

61.     In summary, VGW is subject to jurisdiction of this Court and the Georgia courts and venue within the State of Georgia because the claims (1) arise from VGW's activities; (2) the non-resident defendants, VGW, "purposefully availed" itself or themselves of the privilege of conducting activities within the forum; and (3) the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice" in accordance with *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010); *Admar Int'l Inc. v. Eastbrook, L.L.C.,* 18 F.4th 783 (5th Cir. 2021).

## **INTRODUCTION**

62.     VGW HOLDINGS, as admitted in its audited financial statements filed with the Australian Securities & Investments Commission, actively owns and operates five companies as its agents or alter egos to conduct gambling operations in the State of Georgia.  These companies are VGW MALTA, VGW LUCKYLAND, VGW GP, VGW HOLDINGS US INC., and VGW US INC.  These companies claim to be video game development business entities and operators of a "social

casino." In reality, VGW has created, and operates popular virtual internet gambling casinos that market internet gambling casino games under the names "Chumba Casino" (hereinafter also referred to as "Chumba"), which is operated by VGW MALTA, "LuckyLand Slots" (hereinafter also referred to as "LuckyLand"), which is operated by VGW LUCKYLAND, and "Global Poker," operated by VGW GP. Collectively, these sites are also referred to as "the games" or "casino games" when the websites are described in general terms.

63. In these casino games VGW offers a multitude of electronic versions of slot machines, blackjack, poker, and other games of chance. The games are available to play online at chumbacasino.com for Chumba or VGW MALTA, luckylandslots.com for LuckyLand or VGW LUCKYLAND, and globalpoker.com for Global Poker or VGW GP, which, in addition to poker, provides both games of blackjack and slot machines.

64. VGW has misrepresented to the citizens of Georgia that VGW operates legal video game or arcade game websites permitting just for fun gameplay. However, in reality, VGW intentionally and purposefully operates websites that are illegal, unregulated, and unlicensed internet gambling casinos where Georgia citizens wager and lose real money.

65. VGW HOLDINGS through VGW GP operates slot machines and blackjack games, like Chumba and LuckyLand. In addition, VGW HOLDINGS through

VGW GP, operates an on-line poker game where VGW GP takes a percentage of the money wagered by Georgia citizens that ranges from 2.5 percent to 15 percent in what is identified on globalpoker.com as "the rake." This constitutes operating a gambling transaction or game of chance for which VGW wins money from each hand of poker.

66.    All of VGW's games are virtually identical to gambling or games of chance that exist in legally permitted, but highly regulated brick-and-mortar physical gambling casinos within Georgia. The difference is that VGW's casino games are not legally permitted under Georgia law.

67.    In exchange for payment of "real money" or dollars from Georgia citizens, VGW sells virtual currency, or "coins" that can be used to wager on games of chance. VGW has established a scheme to deprive Georgia citizens of their money or dollars by providing the citizens the potential to win and collect real money prizes or dollars. VGW uses these coins to both give Georgia citizens a false sense of security, while hiding that VGW is engaging in real money gambling. Likewise, VGW has used this scheme to attempt to mislead regulators about the true nature of VGW's operations.

**VGW Formation, History, and Intent to Create Internet Online Gambling**

68.    For over a decade VGW has sought to market and operate online gambling within the United States and Georgia. As early as 2012, the billionaire

founder/CEO of VGW HOLDINGS, Laurence Escalante, expressed his intent to create virtual gambling casinos that would offer Georgia citizens the opportunity to gamble online with "real money" outside the United States, and at that time purportedly within the United States with "virtual currency."

69.     Laurence Escalante outlined the plan during a televised or recorded conference at the "Launch Festival, March 7 and 8, 2012, at the San Francisco Design Center."  A video presentation of this expressed intent can be found at https://www.youtube.com/watch?v=M-ekhp92V-0&list=PPSV.  From 2012 through the present VGW and Laurence Escalante have advertised that they look to combine "virtual currency and gambling."  For many years VGW has targeted Georgia citizens and operated online real money gambling casinos within Georgia, a market known for having extensive restrictions, licensing, and regulations regarding gambling.

70.     VGW's intentional disregard for the laws of the State of Georgia has resulted in at least tens of millions of dollars in illegal gambling winnings going to VGW.

## FACTUAL ALLEGATIONS

**VGW's Predecessors and Model: Illegal Brick-and-Mortar "Sweepstakes Cafés"**

71.    In the early 2010s, across the United States, the spread of "Internet Sweepstakes Cafés" or "Internet Sweepstakes Facilities" (hereafter "sweepstakes cafés") became an epidemic.  Georgia was no exception to this.

72.    These illegal gambling operations would claim to sell internet time or phone cards to Georgia citizens and, as part of an alleged "sweepstakes promotion," Georgia citizens would receive "sweepstakes points" or "sweepstakes credits." These "points" or "credits" – which were redeemable for cash – would be used to wager and gamble on casino style games of chance that were played on computer terminals through the internet at the sweepstakes cafés.

73.    This ploy to circumvent gambling laws was highly lucrative for a time, despite the scheme clearly being illegal gambling under Georgia law.  In 2012, the Georgia General Assembly passed Senate Bill 431 to establish that these so called "sweepstakes promotions" like VGW's are in fact schemes of chance, which are now recognized as gambling under Georgia law, as identified in O.C.G.A. §§ 10-1-393, 16-12-20, and 16-12-22.

74.    Criminal charges were brought against operators of the Georgia internet cafés and in *Patel v. State of Ga.*, 341 Ga. App 419, 801 S.E.2d 551 (2017) the Court of Appeals of Georgia recognized that businesses, even like gas stations that provide customers access to computer games or video games of chance that result

in the payout of lottery tickets or money constitute commercial gambling operations under Georgia law.

75.    However, innovation is a constant where there are financial incentives, and criminal activities are not exempt from that fact.  These gambling sweepstakes café operations moved out of the strip malls and bars that they used to inhabit and now they call the internet home.

76.    VGW pioneered this migration of "sweepstakes casinos" to the world wide web and for many years VGW has knowingly, intentionally, willfully, and illegally won billions of dollars from its gambling operations, while also deceiving  the public and proclaiming that VGW's operations are legal.

**VGW's Purposeful Replication of the Sweepstakes Café Business Model**

77.    VGW parrots the same claim that brick-and-mortar internet sweepstakes facilities, formerly known as sweepstakes cafés, tried to justify their gambling operations across the United States, including in the State of Georgia.  However, legislators, judges, and juries roundly rejected this argument.  The only material difference between VGW and the sweepstakes cafés is that VGW now operates exclusively on the internet rather than conducting gambling on the ground in Georgia.

78.    In a January 4, 2016, prospectus for a sale of stock, VGW admitted its

Chumba website's business model copied the illegal "sweepstakes cafés" that

proliferated Georgia and throughout the United States. (Exhibit "B")

79.    VGW compared its market opportunity with the size of the sweepstakes café

market.  VGW even claimed there is "significant opportunity" in adopting this

sweepstakes model.

80.    The fact this prospectus was released in 2016 is noteworthy because three

years before, in 2012, the Georgia Assembly passed SB 431, which became

O.C.G.A. §§ 10-1-393, 16-12-20, and 16-12-22 and prohibited the operation of

sweepstakes cafés and defined these sweepstakes cafés to be illegal gambling.

Knowing that sweepstakes cafes were illegal, VGW knowingly and intentionally

set out to attempt to thwart Georgia law by creating an internet sweepstakes cafe

intended to operate on an enormous scale and cover all of the United States and

Canada.  VGW violated, and continuously violates, Georgia law by creating and

operating an internet sweepstakes café model online.

81.    For example, VGW's prospectus contains a report that was prepared by H2

Gambling Capital, which is described as "the leading authority regarding market

intelligence on the global gambling industry," further showing VGW's intention to

create nationwide illegal gambling.

82.    The prospectus refers to "gambling" innumerous times and notes that "The US, despite significant prohibition, remains by far the largest gaming market in the world."

83.    The prospectus refers to "real-money" on many occasions and says that VGW is operating at the "convergence of social casino and real-money gaming offerings."

84.    Furthermore, a 2015 press release states that VGW "develops and operates proprietary technology in real-money gaming, enabling cash-prizes to be paid to international players, particularly those located in the United States, via its social casino games." (Exhibit "C")

85.    The same press release states that VGW targets "the unrealised United States real-money gaming market."

86.    These facts show that VGW was intentionally and purposefully taking steps to target Georgia citizens with its gambling websites.  VGW clearly knew that sweepstakes cafés had been banned in Georgia and throughout the United States. Likewise, VGW knew that it was using its online model to operate as a gambling organization, which it knew was already declared illegal under Georgia law.

**VGW's Gambling Offerings and Games of Chance**

87.    All VGW's games are games of chance.  VGW markets and runs games on its websites that are identical, or virtually identical to games of chance that can be found in brick-and-mortar casinos.

88.    VGW's games of chance include, but are not limited to, classic casino games such as slot machines, blackjack, roulette, and poker.  VGW's online poker games, offered through Global Poker, are exactly like poker games in the physical world, but online.  VGW's games possess a user interface identical to games of chance that may be found in brick-and-mortar casinos.  The images below are a sampling of games that are found on VGW's websites.









89.    VGW also offers casino games of chance with a live dealer as well.  The images below are a sampling of games with a live dealer, which are found on VGW's websites.







90.    VGW has also boldly ventured into marketing and selling lottery scratch off card games, in direct competition with state-controlled lotteries, as shown below.







91.    VGW's games, except for their new offerings with live dealers, utilize

algorithms to assign results after the wager is placed.  Once a user presses a button

on the Georgia citizen's computer, phone, tablet, or electronic device of any kind,

VGW's computer servers display entertaining game images to the Georgia citizen,/ bettor and the result of the game is decided by code on VGW's computer servers.

92.    On VGW's websites once the Georgia citizen spins the slot machine by pressing a button the Georgia citizen's device communicates and sends information to VGW's servers.  VGW's servers then execute the games' algorithms that determine the spin's outcome.  None of the outcomes in VGW's slot machine games depend on any amount of skill to determine their outcomes –  all outcomes are based entirely on chance.

93.    In VGW's blackjack and poker, the Georgia citizen makes choices and wagers coins in a manner that is identical, or nearly identical, to placing bets at a casino blackjack table or poker table.  However, it is unknown if the player's choices or decisions affect the outcome as well as the chances of winning, due to the lack of transparency regarding the algorithms employed by VGW.

94.    When playing VGW's games of chance, Georgia citizens put at risk, or wager, money or things of value in the hopes of winning more money or additional things of value.  VGW operates an obvious illegal gambling business that is not permitted or licensed in the State of Georgia.

95.    VGW maintains win and loss records and account balances for each Georgia citizen.  Indeed, once VGW's algorithms determine the outcome of a wager, VGW displays the outcome to the Georgia citizen, VGW then adjusts that Georgia

citizen's account balance.  VGW keeps detailed records of each wager, outcome, win, and the loss for every player of the games.

96.    VGW maintains extremely detailed records of the identity of each individual user of VGW's sites.  To create an account users must verify their identity and address, and provide a copy of photo ID, such as a driver's license.  VGW also maintains detailed records of every individual purchase that Georgia citizens make and every redemption that Georgia citizens receive.  VGW knows exactly how much each individual Georgia citizen has won and lost on VGW's websites and the outcome of every single wager every Georgia citizen has made.

**VGW's Illegal Gambling Scheme and Pretextual Claim That It Is a Sweepstakes**

97.    VGW attempts to thwart Georgia law by boldly and falsely claiming that the VGW websites are legal operations and part of a "social casino" that is offering legally permitted "sweepstakes promotions."

98.    VGW's attempt to camouflage its illegal gambling scheme hinges upon its promotion of a two-tiered system of "coins."

99.    On all its illegal gambling websites, VGW claims to sell "Gold Coins," which have no redeemable value, to Georgia citizens.  These Gold Coins may be used to play casino games on VGW's websites, and their alleged value is the

extension of entertainment by allowing Georgia citizens to play the games just for fun. Gold Coins may be used only to play the games on the sites for entertainment.

100.  However, when selling these Gold Coins VGW also issues the Georgia citizen an allocation of what VGW calls or categorizes as "Sweeps Coins" (Gold Coins and Sweeps Coins are referred to collectively as the "coins").

101.  Sweeps Coins have explicit monetary value. Sweeps Coins may be redeemed for cash to the wagering Georgia citizen's bank account or digital wallet, or as gift cards at an exchange rate of 1:1 (one "Sweeps Coin" being equivalent to $1). Therefore, Sweeps Coins are synonymous with and the equivalent of real currency. When using Sweeps Coins to wager on VGW's games of chance, it is the exact same as using dollars to wager on games of chance in a brick-and-mortar casino. Wagering Sweeps Coins on games of chance is real money gambling and getting Georgia citizens to wager Sweeps Coins is the goal of VGW.

102.  When compared to the illegal sweepstakes cafés that VGW copied, the Gold Coins are analogous to the internet time or phone cards and the Sweeps Coins are analogous to the sweepstakes credits used for wagering and which could be redeemed for cash or money.

103.  The sale of Gold Coins is nothing more than a pretext for the purchasing of, and wagering with, Sweeps Coins in what amounts to a real money online

gambling casino – the exact type of operation that the Georgia Legislature has prohibited.

104.   VGW makes money by taking the other side of the Georgia citizens' / bettors' wagers (betting against the Georgia citizens) in all their games, except for the poker games that exist on VGW GP where VGW makes money by taking a "rake" (a percentage of every pot or wagers made in a hand of poker) or by charging a fee for organizing poker tournaments.

**VGW's Paper Thin Effort to Camouflage Its Illegal Gambling Operations**

105.   Georgia citizens may play games of chance on VGW's sites in what VGW refers to as "standard mode," or "standard play" using Gold Coins.  Georgia citizens may also play the exact same games of chance in what VGW refers to as "promotional mode" or "promotional play" using Sweeps Coins.  Georgia citizens may switch between these two modes easily and as frequently as they would like. An example of the toggle button (from Chumba) permitting this switching is shown below:



106.   It is important to note that it is only possible to play VGW's games through the wagering of either Gold Coins or Sweeps Coins.  It is impossible for a Georgia citizen to play VGW's games when the Georgia citizen does not have a balance of

coins in an account with VGW.  Every one of VGW's games requires a wager to participate.

107.   When playing in standard mode, the Georgia citizen gambles or wagers Gold Coins and can only win or lose Gold Coins.  When playing in promotional mode, the Georgia citizen gambles or wagers Sweeps Coins and can only win or lose Sweeps Coins.

108.   When Georgia citizens visit VGW's websites for the first time, the Georgia citizens are awarded a nominal allocation of "free coins."  Georgia citizens also receive coins as a free daily bonus once a day when logging in to their accounts. An example of the popup message for this "Daily Bonus" (from Chumba) is below:



109.   As can be seen above, the Daily Bonus of Gold Coins is 200,000, which can only be used to play the casino games.  However, the Daily Bonus of Sweeps Coins is much lower or "1," which is the equivalent of $1 dollar that can be redeemed for cash, but only if the Georgia citizen wagers the Sweeps Coin to play the casino games and does not lose the 1 Sweeps Coin or wins more Sweeps Coins.

110.   Until recently, in order to continue playing in the "standard mode," Georgia citizens must either win more Gold Coins from the casino games or replenish their losses by purchasing more Gold Coins.  However, VGW has recently modified this dynamic.  Now, when a Georgia citizen depletes his or her balance of Gold Coins VGW perpetually provides the Georgia citizen with free Gold Coins but no free Sweeps Coins.  This further emphasizes that Gold Coins have zero monetary value to VGW and the Georgia citizen – they are given away for free.  The Gold Coins exist only as a pretext and to entice Georgia citizens into purchasing Sweeps Coins.

111.   When "standard mode" play with Gold Coins is compared to playing in "promotional mode" with Sweeps Coins, it is clear that accumulating Sweeps Coins is the be all and end all of VGW's platforms.  There appears to be no evidence of testimonials by consumers of how they have won Gold Coins from VGW's websites.  However, the internet contains numerous examples of testimonials from happy gamblers of how they have won Sweeps Coins, which they have redeemed for money.  For example, message boards such as Reddit are

populated with players discussing wins and losses of Sweeps Coins. YouTube "influencers," who are sponsored by VGW, have recorded themselves playing with Sweeps Coins for years. LuckyLand's own website shows consumer testimonials telling of their large cash prizes consumers / bettors throughout the United States have won through the wagering of Sweeps Coins. A sample of such testimonials is shown below:



Likewise, video advertisements such as the one below from Facebook in October 2023 display gigantic sized checks to emphasize how consumers can win big money on VGW's sites. This money is only won through wagering Sweeps Coins, not Gold Coins.



Global Poker's own website displays wagerers holding the same style of giant sized checks.



Chumba Casino also advertises on social networks successful gamblers holding gigantic checks to incentivize Georgia citizens to wager Sweeps Coins on their website and attempt to win real money.



Chumba even advertises on social networks that they have **"helped 50 people become millionaires."** from gambling Sweeps Coins, not Gold Coins.



112.    Indeed, VGW advertises that the websites function as gambling operations since the sites call themselves "Chumba **Casino**," "LuckyLand **Slots**" and "Global **Poker**."  Furthermore, shown below is LuckyLand's own logo where it prominently displays stacks of cash with "SC" (an abbreviation frequently used by VGW for Sweeps Coins) written on them, emphasizing the importance of the Sweeps Coins versus Gold Coins.



113.    When Georgia citizens play VGW's games they wager coins on games of chance with the hopes of winning more of the coins that they wagered.  Routinely, after they begin playing, Georgia citizens quickly lose their allotments of coins. This is because a Georgia citizen is playing games of chance that are skewed heavily in the favor of VGW's casino operations – just like in brick-and-mortar casinos.  Furthermore, as with brick-and-mortar casinos, the longer a Georgia citizen plays VGW's games the more likely VGW will ultimately win, and the Georgia citizen will exhaust the coins.  To make matters even worse, VGW, unlike brick-and-mortar casinos, is not subject to a single regulation to ensure fair and legal practices.

114.    When playing with Sweeps Coins – which is the equivalent of playing with real dollars since Sweeps Coins may be redeemed for real cash and cash equivalents – after the Georgia citizens lose all the Sweeps Coins, VGW immediately informs the Georgia citizens that they have insufficient coins to place a wager.  On Chumba users are presented with the below message instructing them to purchase more Gold Coins – as a mechanism to receive Sweeps Coins.



On LuckyLand the user is immediately redirected to the store, as shown below:



On Global Poker the users receive the message below telling them to go purchase coins.



The message is clear.  To keep wagering Sweeps Coins, spending money on Gold Coins is the quick and preferred way to go about it.  What the Georgia citizen really values and is actually purchasing is Sweeps Coins.

115.   When playing on Chumba, upon clicking "Buy Gold Coins," Georgia citizens are redirected to the "Store" where they can purchase more Gold Coins. The majority of the purchase packages also offer Sweeps Coins as part of the purchase of Gold Coins.  The Sweeps Coins amounts are prominently highlighted by VGW in green, likely intended to symbolize the color of money.  Shown below

is an image of the Chumba Store.



116.   In LuckyLand, after exhausting their Sweeps Coins balance, Georgia

citizens are directed to the "LuckyLand Store" (image shown in paragraph 114) to

purchase more Gold Coins.  Every purchase package of Gold Coins provides

Sweeps Coins which are likewise prominently displayed in green.

117.   On Global Poker, when Georgia citizens no longer have any Sweeps Coins

available to wager, they are directed to the store to purchase more coins as well.  It

is clear that when purchasing Gold Coins Georgia citizens receive Sweeps Coins.

An image from Global Poker is shown below:



118.   In the VGW sites and stores Georgia citizens are offered multiple options to purchase coins and purchase packages can vary.  However, for Chumba, prices generally range from $1.00 for 200,000 Gold Coins to $1,000 packages for 400,000,000 Gold Coins; for Global Poker $2 can be used to purchase 10,000 Gold Coins, up to $500 for 2,600,000 Gold Coins; for LuckyLand purchase packages range from $9.99 for 40,000 Gold Coins to $299.99 for 2,100,000 Gold Coins.  So, there is enormous variance between sites in how much a $1.00 payment will net in terms of Gold Coins.

119.   However, the amount of Sweeps Coins delivered in these packages is much more consistent as it tends to be approximately a 1:1 ratio to the "real money" purchase price the Georgia citizen pays – with some extra Sweeps Coins given when the Georgia citizen spends greater quantities of dollars.  For example, on

Chumba and LuckyLand a $300 purchase package would produce 315 Sweeps Coins; on Global Poker a $500 package would produce 515 Sweeps Coins. This small extra amount of Sweeps Coins compared to the dollars spent by Georgia citizens is similar to brick-and-mortar casinos giving "comps" of meals, hotel stays or free wagers to Georgia citizens who spend more money in the brick-and-mortar casinos. VGW also often throws in, or comps, a bonus of extra Sweeps Coins to the Georgia citizens so they will play more. This also shows that it is the Sweeps Coins that have value and are what Georgia citizens are purchasing.

120.   The larger the purchase package the more extra / "comped" Sweeps Coins the Georgia citizen receives. For example, a purchase package that costs $5.00 for Gold Coins will come with 5.05 Sweeps Coins, a difference of 1%. But a package that costs $300 for Gold Coins comes with 315 Sweeps Coins, a difference of 5%. VGW rewards those players who purchase more expensive packages with extra Sweeps Coins, thus stimulating more purchases and more play. This is to incentivize players to purchase more, gamble more and inevitably lose more money.

121.   It is clearly no mistake that at the time of purchase of Gold Coins, the amount of Sweeps Coins available to the Georgia citizen is nearly 1 to 1 for the dollars that the Georgia citizen spends. Obviously, the Georgia citizen would not be spending, for example, $300 to receive 100 Sweeps Coins, much the same way

that no one at a legally permitted Georgia brick-and-mortar casino would pay $300 to receive only $100 in casino chips.

122.   VGW's websites accept payment of dollars in exchange for coins through many forms, including, but not limited to, debit cards, credit cards, bank transfers, gift cards and digital wallet transactions.  An example of the payment options is shown below.



123.   Once a Georgia citizen starts wagering Sweeps Coins on VGW's websites and casino games of chance, and has a sufficient balance, the redemption button is prominently displayed and clearly identifies that the Georgia citizen can redeem the Sweeps Coins for cash or cash equivalent gift cards.  Redeeming Sweeps Coins for dollars is how Georgia citizens can "cash out" – exactly like redeeming casino chips for dollars at a brick-and-mortar casino.  Below are images showing the redemption process on Chumba Casino.  The process is materially identical for Luckyland and Global Poker.







124.   Unlike legally permitted casinos in other states, VGW uses unpermitted techniques to force Georgia citizens to play VGW's games and eventually lose their Sweeps Coins balance.  These techniques include establishing restrictions on how and when Sweeps Coins can be redeemed and turned into money.  For example, on Chumba and Global Poker the minimum permitted redemption amount is 100 Sweeps Coins to be redeemed for $100; on LuckyLand, the minimum is 50 Sweeps Coins to be redeemed for $50.  Therefore, any balance below those thresholds remains stuck on the site and cannot be redeemed, withdrawn or deposited.  This holding of Sweeps Coins captive is VGW's way to force Georgia citizens to continue gambling and more likely lose Sweeps Coins. Likewise, VGW also permits only one redemption of Sweeps Coins per time that the Georgia citizen is utilizing the websites.  Further, VGW has implemented

weeks long delays to "approve" and "process" redemptions of Sweeps Coins. These restrictions are designed to further entice Georgia citizens to cancel their redemption requests and continue playing the casino games. These restrictions are oppressive and aren't even legal at brick-and-mortar casinos where casino gambling may be permitted and is highly regulated.

125.    Winning any actual money through accumulating Sweeps Coins is often a pipe dream, however, because these games of chance are not subject to regulation in the United States (VGW MALTA and VGW GP claim to be regulated in the Island of Malta), and the games certainly heavily favor VGW. In fact, VGW's Terms of Service state that it is the Georgia citizens' responsibility to check on the odds of each game. However, in many cases, these odds are nowhere to be found. Furthermore, VGW also states that VGW may change the odds at VGW's discretion whenever it chooses. VGW's games are therefore a black box that are not regulated or scrutinized in Georgia or anywhere else in the United States for that matter. This is by design because Georgia regulations, if they were followed, would not allow VGW to operate in the state.

126.    All games on VGW's websites fit the Georgia statutory definition of an unlawful gambling activity, a "gambling device," and "commercial gambling" as defined in O.C.G.A. §§ 10-1-393, 16-12-20 and 16-12-22.

127.    Playing games of chance on VGW's websites is clearly real money gambling as Sweeps Coins can be redeemed for cash or real money with an exchange rate of one Sweeps Coins equal to one dollar.  This gambling of Sweeps Coins, the dollar equivalent, is how VGW makes its profits.

128.    VGW has thus devised a scheme whereby players can utilize Sweeps Coins in a manner indistinguishable from a brick-and-mortar casino, but where VGW has misled Georgia citizens into believing that they are playing games that are permitted by Georgia law.  In fact, VGW's websites knowingly, willfully, and prominently advertise the falsehood that the sites are operating legally in the United States and Georgia.  This false claim is included in VGW's websites' Terms of Use for each website.

**VGW's Gambling Operations Utilize Sweeps Coins to Attempt to Avoid Georgia Law and Reap Gambling Profits From Georgia Citizens**

129.    VGW may claim it is not a gambling operation but is a sweepstakes. VGW's claim is that the Sweeps Coins it markets to Georgia citizens have no value because the Sweeps Coins cannot be redeemed for money by a Georgia citizen at the time of purchase or acquisition.

130.    VGW's claim that "…Sweeps coins cannot be purchased and [have] no inherent value. …" *https://www.chumbacasino.com/about-us* is extremely disingenuous and contrary to VGW's own advertisements.  The Gold Coins

purchase packages sold to Georgia citizens prominently display the amount of Sweeps Coins the Georgia citizen receives, VGW's websites advertise how Sweeps Coins can be redeemed with payment of money from VGW being sent directly to Georgia citizens' bank accounts, digital wallets, or gift cards, where 1 Sweeps Coins is equal to 1 dollar. VGW's advertising strategy focuses on showing winners of large amounts of Sweeps Coins.

131.   As a part of VGW's gambling scheme and attempt to maintain a façade of legality and attempt to present itself as a legal sweepstakes, Georgia citizens can accumulate Sweeps Coins in multiple ways:

  a.  By receiving Sweeps Coins upon the purchase of specifically marked packages of Gold Coins;

  b.  By entering "Sweeps Coins no-cost give away contests" on the games' Facebook pages;

  c.  By sending a request letter through the United States Postal Service to VGW MALTA, VGW LUCKYLAND, and VGW GP, respectively; and,

  d.  As a "Daily Bonus" given when logging on to the players account (once per day). *https://www.chumbacasino.com/sweeps-rules*

Georgia citizens, however, are highly incentivized toward option "a."  This is because option "a" is instantaneous and allows large amounts to be purchased. Whereas the other options vary from exceedingly difficult and slow (taking months to write, send letters and receive credits for sending a mail request) to very small (only receiving 1 Sweeps Coins per day from the "Daily Bonus").  The purchase of Gold Coins is the easiest and quickest way for a Georgia citizen to obtain Sweeps Coins and serves as a pretext to sell Sweeps Coins and facilitate real money gambling.  VGW uses options "b.," "c.," and "d." to attract customers but the primary motivation is so VGW can attempt to argue no purchase is necessary and therefore there is no consideration; sweepstakes cafés futilely attempted this same tactic and argument.

132.   Georgia citizens are required to wager their Sweeps Coins before they are permitted to redeem Sweeps Coins.  In its Terms of Service, VGW includes a link to its "Sweeps Rules" which VGW claims governs its "sweepstakes promotions" (https://www.chumbacasino.com/sweeps-rules) where VGW claims that it is operating legally because Sweeps Coins are unable to be redeemed before wagering and therefore have no value.  Only after wagering Sweeps Coins and, in the unlikely scenario that Georgia citizens win the wager, do the Sweeps Coins that are won have monetary value and can be redeemed.  In VGW's own words in their Sweeps Rules, the Sweeps Coins "…that have been won through game play can

then be redeemed for a prize with a value equal to US $1.00 per SC [Sweeps Coin]." This is VGW's way to force Georgia citizens to wager and risk losing money. In other words, Georgia citizens are required to play the games of chance or gamble on VGW's site with Sweeps Coins with a 1-time playthrough in order to later redeem the Sweeps Coins and collect a prize of cash or cash equivalents.

133.   VGW may claim that the award of Sweeps Coins to Georgia citizens is like an award of legitimate and legal sweepstakes prizes. In reality, however, Georgia citizens must either purchase Sweeps Coins or otherwise provide some monetary consideration to obtain Sweeps Coins, whether in the form of direct purchases of Gold Coins or by expending the costs of preparing and mailing in requests to VGW. Any other methods of obtaining Sweeps Coins provide only nominal amounts of Sweeps Coins. As in the case of legally permitted brick-and-mortar casinos, Georgia citizens are only able to obtain Sweeps Coins in much the same manner as a customer purchasing chips at the brick-and-mortar casino. Likewise, except for direct purchases of Sweeps Coins, VGW can and does arbitrarily limit the bonuses of Sweeps Coins upon purchases of Gold Coins to certain Georgia citizens.

134.   VGW often arbitrarily rejects submissions of mailed requests for Sweeps Coins, contrary to the normal, legitimate, sweepstakes process. VGW also

frequently deactivates the accounts of Georgia citizens who submit mailed requests for Sweeps Coins and gives no explanation for doing so.

135.   Georgia citizens are encouraged by VGW's businesses to focus on wagering Sweeps Coins so that they may win "real money" in the form of winning more Sweeps Coins.

**Legal Sweepstakes Compared to VGW's Illegal Gambling Business**

136.   An example of legal and legitimate sweepstakes is the famous McDonald's Monopoly sweepstakes where, in exchange for purchasing a sandwich or drink, the consumer has a chance to win a prize.

137.   A legal and legitimate sweepstakes is a limited-term event, designed to attract consumer attention and to expire after a few weeks or months.  Whereas VGW – exactly like the sweepstakes cafés VGW was modeled after – offers perpetual "sweepstakes" and wagering to earn the perpetually offered "cash prizes."  The VGW sweepstakes are the entire reason the business exists.

138.   A legal and legitimate sweepstakes is intended to increase consumer awareness and sales of its products – such as hamburgers, fries, and sodas.  VGW, by contrast, claims to be selling Gold Coins as its primary product.  However, customers amass gigantic totals of unused Gold Coins while wagering with Sweeps Coins.  Furthermore, VGW's own marketing campaigns and marketing materials ignore the Gold Coins while emphasizing the Sweeps Coins.

139.   A legal and legitimate sweepstakes pays a trivial share of its revenue in prizes because the sponsor's business is selling other products, not offering wagers on chance.  However, according to VGW's audited financial statements, VGW pays billions of dollars annually representing a casino-like percentage of consumer purchases/deposits.

140.   VGW operates an illegal gambling business and not a legal and legitimate promotional sweepstakes.

**VGW's Casino Games and Illegal Scheme of Chance Cause Immense Losses to Citizens of Georgia:**

141.   VGW proactively defrauds Georgia citizens because VGW advertises that its operations are legitimate and legal.  VGW publishes the intellectually dishonest claim that VGW does not operate gambling platforms.  VGW claims to operate a "social casino" which does not allow real money gambling; VGW claims that in conjunction with the "social casino" VGW merely offers "sweepstakes promotions" that provide "cash prizes."  This is the same attempted scheme that the previously described brick-and-mortar sweepstakes cafés unsuccessfully argued.

142.   In reality, VGW knowingly and willfully operates what constitutes an illegal gambling enterprise.  The Terms of Service across VGW's various sites further defraud Georgia citizens by stating that citizens will not be allowed to play on

VGW's platforms in states where they are prohibited.  However, VGW claims that Georgia permits VGW's operations when it knows that to be untrue.

143.   VGW's audited financials show VGW spends hundreds of millions of dollars advertising VGW's platforms and, in such advertisements, erroneously advertise its own legality and thus VGW has defrauded and manipulated Georgia citizens into engaging in illegal gambling and losing money.

144.   VGW uses targeted advertising across social networks, advertises on search engines such as Google, sponsors YouTube gambling channels and more, to entice Georgia citizens to gamble on VGW's platforms.  For example, VGW has sponsored Ferrari's Formula One racing team and has become a sponsor of a NASCAR racing team, 23XI – owned by basketball legend Michael Jordan. Furthermore, VGW hires celebrities, such as Ryan Seacrest, DJ Khaled, and famous athletes Michael Phelps, Karl Anthony Towns, and Paul George (shown below) to create a veneer of legitimacy – exactly like infamous illegal gambling sites Full Tilt Poker and PokerStars used to do before those sites were shut down in the United States.











**VGW**
19,027 followers
3d · 🌐

+ Follow    ⋯

We're excited to announce our newest partnership between Chumba Casino and **23XI Racing**!

Kicking off February 2 with the start of the NASCAR season, the vibrant colours of Chumba Casino will be seen across all three Toyota Camry 23XI cars.

Drivers Bubba Wallace, Tyler Reddick, and Riley Herbst will be behind the wheel and sporting Chumba Casino's branding on their fire suits and team gear all season long.

We couldn't be more excited for this collaboration with an iconic U.S. brand, and can't wait to see Chumba on the track!

Read more here: **https://lnkd.in/gb2fAkcd**

**#vgw #chumbacasino #23XIracing #nascar**





We got a fresh, new look for the 23, 35, and 45. The No. 35 Chumba Casino Toyota Camry will debut at COTA. Stay tuned for when the 23 and 45 will hit the track 👀

ChumbaCasino.com
NO PURCHASE NECESSARY. VGW Group. Void where prohibited by law. See T&Cs. 21+.
#paidpartnership



145.    VGW's illegal gambling operation has been extremely lucrative as evidenced by a portion of VGW's audited financial statements (where all numbers are in thousands of Australian dollars) for the fiscal year ended June 30, 2024, shown below.  For example, in 2024, VGW obtained revenue of Six Billion One

Hundred Thirty-Three Million Six Hundred Ninety-Five Thousand Australian dollars. ($6,133,695,000), or approximately Four Billion American dollars ($4,000,000,000).



**CONSOLIDATED STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME FOR THE YEAR ENDED 30 JUNE 2024**

| Continuing operations | Note | 2024 $'000 | 2023 $'000 |
|---|---|---|---|
| Revenue from contracts with customers | 4 | 6,133,695 | 4,835,148 |
| Sweepstakes prizes | | (4,344,531) | (3,355,545) |
| Merchant fees | | (306,713) | (248,902) |
| Finance income | 5 | 13,529 | 5,753 |
| Finance costs | 5 | (41,656) | (10,849) |
| Foreign currency loss | 5 | (7,116) | (22,654) |
| Other income | 5 | 127 | 217 |
| Marketing and advertising fees | 5 | (418,005) | (359,987) |
| Contract labour, legal and professional fees | | (44,132) | (53,231) |
| Game development and licence fees | | (27,396) | (12,153) |
| Employee benefits expense | 6 | (151,994) | (116,862) |
| Share-based payments expense | | (783) | (24,396) |
| Depreciation and amortisation expense | | (9,441) | (6,927) |
| Technology and other communication expense | | (66,350) | (47,984) |
| Property and occupancy expense | | (2,594) | (2,281) |
| Sponsorship, general and administration expense | | (49,462) | (33,199) |
| Total operating expenses | | (5,456,517) | (4,289,000) |
| **Profit before income tax** | | **677,178** | **546,148** |

146.  It is thus clear that VGW through its websites, chumbacasino.com, globalpoker.com and luckylandslots.com operate illegal gambling operations in the State of Georgia.  VGW pays no taxes to the State of Georgia and has not obtained permits from the State of Georgia for its operations.

147.  VGW's audited financial statements, and investor reports, clearly show that VGW has earned billions of dollars in gambling wins from United States citizens.

Tens of millions, if not more, of these losses come directly from citizens of the State of Georgia.

148.   In fact, as VGW has continued to operate with impunity, over the past five years VGW's revenue has increased at an average annual growth rate of approximately 75%.  Over the past five years VGW's advertising expenditure increased at an average annual growth rate of approximately 50%.  Over the past five years losses sustained by consumers playing on VGW's illegal gambling internet websites have increased at an average annual growth rate of 58%.  Over the past five years VGW's pretax income has increased at approximately 92%.

149.   Furthermore, the fact that VGW has continued to operate freely and achieve such large economic profits has spurned the creation of many copycat websites which operate illegally, deprive consumers of their money, and deprive the government of tax revenue.

150.   VGW maintains detailed records of every individual bettor's identity, individualized data about each bettor's purchase and redemption history, and the bet-by-bet history of the results of every single bet that was made.  In fact, VGW has admitted under oath on several occasions that VGW captures detailed consumer data at the point of sale of the coins.  Therefore, VGW maintains all records necessary to calculate and reveal the losses sustained by citizens of the State of Georgia.

**VGW Continuously Breaking the Law**

151.   VGW was sued in the Commonwealth of Kentucky in 2022 and expeditiously reached a class action settlement that required VGW to pay $11,750,000 for violations of Kentucky's gambling laws.

152.   Despite paying this large sum and being on official notice that its operations are illegal, VGW has brazenly chosen to continue breaking the law and operate its illegal gambling business within Kentucky.

153.   VGW also received an order to cease operating in the state of Delaware on February 23, 2023, but continues to operate. (Exhibit "D")

154.   VGW received an order to cease operating in Connecticut on February 9, 2024, but chose to ignore the order for at least seven months before finally adhering to Connecticut's order to leave. (Exhibit "E")

155.   VGW is currently being sued in at least ten states but has chosen to continue operating its unambiguously illegal gambling websites across the majority of the United States.

**VGW Preys Upon Georgia Citizens and its activities are Societally Dangerous**

156.   The State of Georgia has long considered illegal gambling operations to be a nuisance and societally dangerous.  Legal, permitted gambling is highly regulated and subject to immense government oversight.

157.    VGW's illegal online gambling business is particularly insidious and

dangerous because it leverages modern technology (the internet, smartphones,

tablets, computers, and algorithms) to manipulate Georgia citizens into becoming

gambling addicts and provides these Georgia citizens with the ability to satisfy this

addiction 24 hours a day, 7 days a week, 365 days a year, from their home, work,

on vacation, or anywhere Georgia citizens have internet access.

158.    Every type of gambling has the potential to be highly addictive.  It is well

documented that even non-paying "social casino" offerings – those which do not

provide the ability to redeem coins for real money – generate immense financial

damage to their customers.  A 2020 NBC News article, "Addicted to losing: How

casino-like apps have drained people of millions," found on the internet at

https://www.nbcnews.com/tech/technews/addicted-losing-how-casino-apps-

%20have-drained-people-millions-n1239604, chronicled how a sample of 21

people described how they were hooked on casino-style apps, and emphasized the

story of a nurse in Houston who played social casino games for "at least two hours

a day."  This nurse estimated that she and her husband together have lost $150,000

on these kinds of websites.  She said that she and her husband "lie in bed next to

each other, we have two tablets, two phones, and a computer and all these apps

spinning Reel Rivals at the same time."  Tragically, her story is not unique .

> NBC News spoke to 21 people, including Shellz [the Houston nurse]
> and her husband, who said they were hooked on the casino-style

games and spent significant sums of money. They described feelings of helplessness and wanting to quit but found themselves addicted to the games and tempted by the company's aggressive marketing tactics.

Most of the 21 players wished to remain anonymous, as they were ashamed of their addictions and did not want their loved ones to find out about their behavior.

159.   As recently as 2022, the Australian community has seen instances of adults becoming addicted to online, so called social casino games.  In a post titled "What are social casino games, and why do people become addicted?" at https://www.abc.net.au/news/2022-03-01/social-casino-games-and-why-people-become-addicted/100861446, the Australian website noted the following:

…Actual online casino gambling — as in, playing these games for money — is banned in Australia. But in social casino games, you can't win anything — so it's technically not gambling, and is much less regulated than the real thing.

The global social casino market generates billions in revenue each year. For some people, these gambling simulators are just as harmful as the real thing. Last month, a Mackay woman was jailed after stealing nearly $1 million to fund her social casino game addiction, while a Perth man spoke of sinking $800 on a virtual slot game in a matter of minutes. …

This is ironic since VGW HOLDINGS, the parent company controlling and operating all VGW games and websites is an Australian company that appears to be prohibited from spreading its illegal internet gambling into its home country, while attempting to flourish in the North American markets.

160.   And it is not just news media and internet authors who have raised concerns regarding internet social casinos.  In the Second Amended Complaint filed in the case of *Benson v. Double Down Interactive, LLC*, Case No. 2:18-cv-00525-RSL (W.D. Wash. 2018) the plaintiffs cited several studies in support of their argument that internet gambling sites like VGW's sites have led to gambling addiction.  The result in *Benson v. Double Down, supra,* was a nationwide class action settlement of $415,000,000 that was approved in 2022.   A portion of that Complaint and the citation to studies is attached as Exhibit "F."

161.   Even as recently as December 23, 2024, as part of the plaintiffs' Third Amended Complaint in *Larsen v. PTT, LLC and High 5 Entertainment LLC,* Case No. 3:18-cv-05275-TMC (W.D. Wash. 2018), allegations and citations to additional authors and texts describe the addictive propensities of online social gambling games such as VGW's.  A portion of that Complaint and the citations are attached as Exhibit "G."

162.   VGW's games are even more damaging than the games chronicled in paragraphs 158-161 because VGW's games offer not only social casino games, but also real money gambling with Sweeps Coins.

163.   Gambling is highly regulated for a reason and illegal gambling is strictly prohibited in the State of Georgia.  However, VGW is attempting to skirt all regulations and operate illegally in the State of Georgia by claiming it is not

operating within Georgia, and it is simply a social casino.  Furthermore, VGW attempts to escape civil litigation to provide compensation to its victims and escape the jurisdiction of the Courts by utilizing illegal and "void" Terms of Service, which are contrary to Georgia public policy under O.C.G.A. § 13-8-2.  These attempts include arbitration clauses, forum selection clauses, and choice of law provisions which are likewise "void" and contrary to Georgia public policy because under Georgia law they are contracts based on illegal gambling consideration.  Also, there is an important public policy interest in adjudicating this case in this Court in the State of Georgia.

164.   In addition, VGW's Terms of Service, including each and every clause attempting to compel arbitration, and all attempts at creating class waivers, forum selection clauses and choice of law provisions are likewise "void" and contrary to Georgia public policy under O.C.G.A. § 13-8-2.  VGW's Terms of Service are so one-sided that they are unconscionable and illusory.  In part, this is because, VGW has inserted approximately 60 provisions within its Terms of Service that allow VGW to arbitrarily refuse to pay winning gamblers including Georgia citizens' their prizes or money, unlike properly legalized, licensed, and regulated brick-and-mortar casinos and gambling operations that are prohibited from exercising such unfettered power.  A table describing these clauses in VGW's Terms of Service is attached as Exhibit "H," and incorporated as part of this Complaint.  These type

clauses make each and every part of the VGW Terms of Service void and unenforceable by VGW just as described by the Georgia courts. *Innovative Images, LLC v. Summerville,* 309 Ga. 675, 848 S.E.2d 75 (2020); *Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc.,* 215 Ga. App. 194, 450 S.E.2d 427, 431 (1994).

**Plaintiff's Lawsuit to Simultaneously Deter Illegal Gambling and Compensate Victims**

165.   This action is being brought under O.C.G.A. § 13-8-3 a statute that has the purpose of simultaneously compensating those who have lost money to illegal gambling operations but also deter illegal gambling by making illegal gambling operations, such as VGW's, unprofitable by forcing them to return their illegal earnings.  O.C.G.A. § 13-8-3 provides a powerful enforcement mechanism to disincentivize illegal gambling, protect Georgia citizens, and provide funds for the educational use of the Georgia counties.

166.   The Georgia legislature has also emphasized its public policy to deter illegal gambling and provide remedies.  This is evidenced by the fact that not only the loser of an unlicensed gambling wager is allowed to sue and recover losses but that right also extends to a third party who may seek recovery for that third party's use and the educational needs of the Georgia counties.

## <u>CLASS ACTION ALLEGATIONS</u>

167.   Plaintiff seeks to sue VGW and Plaintiff seeks to represent a class defined as and limited to all citizens of the state of Georgia who suffered losses of money on Chumba Casino, Global Poker, or LuckyLand Slots and VGW during the applicable limitations period (hereafter the citizens of the state of Georgia are also referred to as the "Class").

168.   VGW argues that their Terms of Service contain a class waiver prohibiting wagerers from participating in class action lawsuits and therefore no class should be certified.  However, VGW's Terms of Service are "void."  Furthermore, like the arbitration clauses, forum selection clauses, and choice of law provisions, this class waiver – even when severed from the Terms of Service – is a contract based on illegal gambling consideration and therefore "void" under O.C.G.A. § 13-8-3.

169.   Specifically excluded from the Class are VGW, their officers, directors, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by VGW, and the heirs, successors, assigns, or other persons or entities related to or affiliated with VGW and or VGW's officers and or directors, the judge assigned to this action, and any member of the judge's immediate family.

170.   Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended Complaint.

171.   **Numerosity**:  On information and belief numerous Georgia citizens fall into the definition of the Class. Members of the class can be identified through VGW's records, discovery and other third-party sources.

172.   **Commonality and Predominance**:  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. The common legal and factual questions include, but are not limited to, the following:

173.   **Typicality**:  Plaintiff's claims are typical of the claims of the other members of the Class and that among the other things all Class members were similarly situated and were comparably damaged through VGW's wrongful conduct as set forth herein.  The claims of all Class members are similar in that they all lost money playing the games owned by VGW.  Further there are no defenses available to VGW that are unique to Plaintiff.

174.   **Adequacy of Representation**:  Plaintiff will fairly and adequately protect the interests of the Class, which is estimated to consist of numerous Georgia citizens.  Plaintiff has retained counsel that has more than thirty-five years' experience, mostly in litigation in the states of Florida and Georgia.  , and Plaintiff intends to vigorously prosecute the action on behalf of the Class.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

175. **Superiority**:  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriments suffered by individual Class members are relatively small compared to the burden and expense of individual litigation on their claims against VGW.  It would thus be virtually impossible for the Class to obtain effective redress for the wrongs committed against the members on an individual basis. Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by the action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

## CAUSES OF ACTION

## COUNT I

## SUIT – RECOVER MONEY LOSSES

## O.C.G.A. § 13-8-3

176.   Plaintiff, individually and on behalf of the Class sues VGW and realleges paragraphs 1-175, above.

177.   O.C.G.A. § 13-8-2 states:

   (a) A contract that is against the policy of the law cannot be enforced.  Contracts

      deemed contrary to public policy include but are not limited to:

      *****

      (4) Wagering contracts

178.   O.C.G.A. § 13-8-3 specifically declares that all agreements and contracts for

gambling transactions are void.  Therefore, the winner of a gambling transaction

has no right to keep the money under Georgia law.

179.   Specifically, O.C.G.A. § 13-8-3 states:

**§ 13-8-3. Gambling contracts**

   (a) Gambling contracts are void; and all evidences of debt, except
negotiable instruments in the hands of holders in due course or
encumbrances or liens on property, executed upon a gambling
consideration, are void in the hands of any person.

   (b) Money paid or property delivered upon a gambling consideration
may be recovered from the winner by the loser by institution of an
action for the same within six months after the loss and, after the
expiration of that time, by institution of an action by any person, at
any time within four years, for the joint use of himself and the
educational fund of the county.

180.   Plaintiff is authorized to proceed with litigation against VGW to recover all

losses that she suffered, and those losses suffered by the Class, the other citizens of

Georgia, at least for the period from September 7, 2023, till March 7, 2024.

181.  Plaintiff and the Class are recognized and entitled by Georgia law to the

return of all gambling or gaming losses suffered by Plaintiff and the Class because

any such gambling agreements are void.

182.  O.C.G.A. § 13-8-3 authorizes the Plaintiff to obtain a judgment on behalf of

Plaintiff and the Class as provided by O.C.G.A. § 13-8-3(b).


WHEREFORE, Plaintiff requests a judgment against Defendants VGW

HOLDINGS LIMITED, including its subsidiaries VGW MALTA LIMITED, VGW

LUCKYLAND INC., and VGW GP LIMITED, VGW HOLDINGS US INC., and

VGW US INC. for all money paid or property delivered to each and all of the

above-named Defendants as authorized by O.C.G.A. § 13-8-3(b) for the monetary

losses incurred Plaintiff and the citizens of the state of Georgia, the Class for the

last the 6 month period beginning on September 7, 2023, through the date of this

Complaint, and that the Court grant such other just and appropriate relief

.**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury of any and all issues in this action so triable by
Georgia law.

/s/ *Barry L. Williams*

Barry L. Williams
P.O. Box 1483
Villa Rica, Georgia 30180
404-519-4586
Georgia Bar No. 538108

Email: advocatedib@gmail.com

Attorney for Plaintiff
DESTINY KENNEDY

## **RULE 7.1D CERTIFICATE OF TYPE, FORMAT AND FONT SIZE**

Under Local Rule 7.1D of the United States District Court for the Northern

District of Georgia, the undersigned certifies that this submission to the Court was

computer-processed, double-spaced between lines, and prepared with 14-point

Times New Roman font.

/s/ *Barry L. Williams*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 24th day of March 2025, served this

Amended Complaint by efiling using the Court's electronic filing system, which

will automatically forward a copy to counsel of record in this matter

/s/ *Barry L. Williams*

Barry L. Williams
P.O. Box 1483
Villa Rica, Georgia 30180
404-519-4586
Georgia Bar No. 538108
Email: advocatedib@gmail.com

Attorney for Plaintiff
DESTINY KENNEDY