# EXHIBIT "B"




# PROSPECTUS

## SYNERGY PLUS LIMITED

TO BE RENAMED VGW GAMING LIMITED

091 126 082

For personal use only

Corporate Advisors:
indianocean


For personal use only




# Prospectus

For a public offer of up to 70,000,000 Shares (post-Consolidation) at an issue price of $0.05 per New Share to raise up to $3,500,000 (**Public Offer**).

**The Public Offer is scheduled to close at 5:00pm (WST) on 9 February 2016 unless extended or withdrawn. Applications must be received before that time to be valid.**

This Prospectus also contains:

- an offer of up to 932,183,398 Shares and 95,662,112 Options (post-Consolidation) to the VGW Holdings Vendors in consideration for the acquisition of all of the issued capital in VGW Holdings (**VGW Holdings Offer**). Refer to Section 2.1.2 of this Prospectus for further details of the VGW Holdings Offer;
- an offer of up to 19,000,000 Shares (post-Consolidation) to the Synergy Lenders in consideration for conversion and repayment of the SNR Lenders (**SNR Lender Offer**). Refer to Section 2.1.3 of this Prospectus for further details of the SNR Lender Offer;
- an offer of up to 20,000,000 Shares and 6,000,000 Options (post-Consolidation) to Minimum Risk in consideration for conversion and repayment of the Minimum Risk Loan (**Minimum Risk Offer**). Refer to Section 2.1.4 of this Prospectus for further details of the Minimum Risk Offer;
- an offer of up to 47,350,067 Employee Loan Shares and 96,926,780 Employee Incentive Options (post-Consolidation) to the VGW Holdings employee (**Employee Offer**). Refer to Section 2.1.5 of this Prospectus for further details of the Employee Offer;
- an offer of up to 9,000,000 Options (post-Consolidation) to the Company's incoming Executive Chairman, Mr Nigel Blythe-Tinker (**Chairman Offer**). Refer to Section 2.1.6 of this Prospectus for further details of the Chairman Offer;
- an offer of up to 650,000,000 Performance Shares (post-Consolidation) to Lance East Corporation (**Lance East Offer**). Refer to Section 2.1.7 of this Prospectus for further details of the Lance East Offer; and
- an offer of up to 72,500,000 New Options (post-Consolidation) to Minimum Risk (or its nominee) as part consideration for underwriting the Public Offer (**Underwriter Offer**). Refer to Section 2.1.8 of this Prospectus for further details of the Underwriter Offer.

  (collectively, the **Transaction Offers**)

**The Transaction Offers are scheduled to close at 5:00pm (WST) on 9 February 2016 unless extended or withdrawn. Application must be received before that time to be valid.**

Completion of each of the Offers is conditional upon Shareholders approving, at the General Meeting to be held on 29 January 2016, various resolutions, including the change in nature and scale of activities, consolidation of capital and the issue of the Shares and Options offered by this Prospectus. Please refer to Section 2.2 of this Prospectus for further details.

## IMPORTANT INFORMATION

This Prospectus is a re-compliance prospectus for the purposes of satisfying Chapters 1 and 2 of the ASX Listing Rules and to satisfy the ASX requirements for re-listing following a change to the nature and scale of the Company's activities.

All references to Securities in this Prospectus are made on the basis that the 50:1 Consolidation, unless otherwise stated, for which Shareholder approval is being sought at the General Meeting to be held on 29 January 2016, has taken effect.

This is an important document that should be read in its entirety.

If you do not understand it you should consult your professional advisers without delay. The Securities offered by this Prospectus should be considered highly speculative.

For personal use only

For personal use only

# Contents

Corporate Directory 5
Important Notice 6
Key Offer Information 8
Chairman's Letter 9
1 Investment Overview 11
2 Details of the Offers 47
3 Company Overview Upon Completion of Acquisition 57
4 Independent Industry Report 67
5 Risk Factors 103
6 Financial Information 115
7 Investigating Accountant's Report 135
8 Board, Management and Corporate Governance 139
9 Material Contracts 151
10 Additional Information 161
11 Directors' Authorisation 179
12 Glossary 181




For personal use only

# Corporate Directory

## DIRECTORS

Domenic Martino
*Non-Executive Chairman*

Christopher Martino
*Non-Executive Director*

Philip Silva
*Executive Director*

## PROPOSED DIRECTORS

Nigel Blythe-Tinker
*Proposed Executive Chairman*

Laurence Escalante
*Proposed Managing Director and Chief Executive Officer*

Mats Johnson
*Proposed Executive Director*

Lorenzo Escalante
*Proposed Non-Executive Director*

## COMPANY SECRETARIES

Leanne Ralph
*Non-Executive Director*

Jackob Tsaban
*Non-Executive Director*

## PROPOSED COMPANY SECRETARY

Rointon Nugara
*Company Secretary*

## ASX CODE

Current: SRN
Proposed: VGW

## REGISTERED OFFICE

C/- Ground Floor,
8 St Georges Terrace,
Perth WA 6000

Telephone: +61 2 8263 0515
Facsimile: +61 2 8263 0500

## SOLICITORS

Hunt & Humphry
15 Colin Street,
West Perth WA 6005

HopgoodGanim Lawyers
Level 27, 77 St Georges Terrace,
Perth WA 6000

## INVESTIGATING ACCOUNTANT

Sothertons L.L.P.
Level 6
468 St. Kilda Road
Melbourne VIC 3004

## AUDITOR*

RSM Australia Partners
Ground Floor,
8 St Georges Terrace,
Perth WA 6000

## SHARE REGISTRY*

Security Transfer Registrars Pty Limited
770 Canning Highway
Applecross WA 6153

Telephone: +61 8 9315 2333
Facsimile: +61 8 9315 2233

* This entity is included for information purposes only. It has not been involved in the preparation of this Prospectus.

For personal use only

# Important Notice

This Prospectus is dated 4 January 2016 and was lodged with the ASIC on that date. The ASIC and its officers take no responsibility for the contents of this Prospectus or the merits of the investment to which this Prospectus relates.

No Securities may be issued on the basis of this Prospectus later than 13 months after the date of this Prospectus.

Application will be made to the ASX within seven days after the date of this Prospectus for Official Quotation of the Shares the subject of this Prospectus.

No person named in this Prospectus, nor any other person, guarantees the performance of the Company. No person is authorised to give information or to make any representation in connection with this Prospectus, which is not contained in the Prospectus. Any information or representation not so contained may not be relied on as having been authorised by the Company in connection with this Prospectus.

The distribution of this Prospectus in jurisdictions outside Australia and New Zealand may be restricted by law and persons who come into possession of this Prospectus should seek advice on, and observe any of these restrictions. Failure to comply with these restrictions may violate securities laws. Applicants who are resident in countries other than Australia and New Zealand should consult their professional advisers as to whether any governmental or other consents are required or whether any other formalities need to be considered and followed.

This Prospectus does not constitute an offer in any place in which, or to any person to whom, it would not be lawful to make such an offer. No action has been taken to register or qualify the Securities or the Offers or to otherwise permit a public offering of the Securities in any jurisdiction outside Australia.

It is important that you read this Prospectus in its entirety and seek professional advice where necessary. The Securities the subject of this Prospectus should be considered highly speculative.

## RISK FACTORS

Potential investors should consider that an investment in the Company is highly speculative and should consult their professional advisers before deciding whether to apply for Securities pursuant to this Prospectus. For further information in relation to the risk factors of the Company please refer to the summary in the Investment Overview Section in Section 1 and Section 5 of this Prospectus.

## PRECONDITIONS TO ISSUE

The Offers made under this Prospectus and the issue of Shares, Options and Performance Shares pursuant to this Prospectus is subject to and conditional upon the Preconditions to Issue. If the Preconditions to Issue are not satisfied, no Shares will be allotted pursuant to this Prospectus and the Company will repay all money received from Applicants without interest. Accordingly, where relevant, this Prospectus assumes that the Preconditions to Issue have been satisfied.

## EXPOSURE PERIOD

Applications for Securities under this Prospectus will not be processed until after expiry of the Exposure Period pursuant to Chapter 6D of the Corporations Act. No preference will be conferred on Applications received during the Exposure Period. All Applications received during the Exposure Period will be treated as if they were simultaneously received on the Opening Date. If the Exposure Period is extended by ASIC, Applications will not be processed until the expiry of the extended Exposure Period.

The purpose of the Exposure Period is to enable examination of this Prospectus by market participants prior to the acceptance of Applications and the raising of funds. That examination may result in the identification of deficiencies in this Prospectus and, in those circumstances, any Application that has been received may need to be dealt with in accordance with section 724 of the Corporations Act.

## PHOTOGRAPHS AND DIAGRAMS

Photographs used in this Prospectus which do not have descriptions are for illustration only and should not be interpreted to mean that any person shown endorses the Prospectus or its contents or that the assets shown in them are owned by the Company. Diagrams used in this prospectus are illustrative only and may not be drawn to scale.

## WEB SITE – ELECTRONIC PROSPECTUS

A copy of this Prospectus can be downloaded from the website of the Company at **www.vgw.co**. If you are accessing the electronic version of this Prospectus for the purpose of making an investment in the Company, you must be an Australian or New Zealand resident and must only access this Prospectus from within Australia or New Zealand.

The Corporations Act prohibits any person passing onto another person an Application Form unless it is attached to a hard copy of this Prospectus or it accompanies the complete and unaltered version of this Prospectus. You may obtain a hard copy of this Prospectus free of charge by contacting the Company.

The Company reserves the right not to accept an Application Form from a person if it has reason to believe that when that person was given access to the electronic Application Form, it was not provided together with the electronic Prospectus and any relevant supplementary or replacement prospectus or any of those documents were incomplete or altered.

## FORWARD-LOOKING STATEMENTS

This Prospectus contains forward-looking statements which are identified by words such as 'may', 'could', 'believes', 'estimates', 'targets', 'expects', or 'intends' and other similar words that involve risks and uncertainties.

These statements are based on an assessment of present economic and operating conditions, and on a number of




For personal use only

assumptions regarding future events and actions that, as at the date of this Prospectus, are expected to take place.

Such forward-looking statements are not guarantees of future performance and involve known and unknown risks, uncertainties, assumptions and other important factors, many of which are beyond the control of our Company, the Directors and our management.

We cannot and do not give any assurance that the results, performance or achievements expressed or implied by the forward-looking statements contained in this prospectus will actually occur and investors are cautioned not to place undue reliance on these forward-looking statements.

We have no intention to update or revise forward-looking statements, or to publish prospective financial information in the future, regardless of whether new information, future events or any other factors affect the information contained in this prospectus, except where required by law.

These forward looking statements are subject to various risk factors that could cause our actual results to differ materially from the results expressed or anticipated in these statements. These risk factors are set out in Section 5 of this Prospectus.

## NOTE TO APPLICANTS

This Prospectus does not provide investment advice. You should seek your own investment and/or financial advice in relation to the Offer. The Offer contained in this Prospectus does not take into account your investment objectives, financial situation and particular needs. It is important that you read this Prospectus carefully and in full before deciding to invest in the Company. In particular, in considering the prospects of the Company, you should consider the risk factors that could affect the financial performance of the Company in light of your personal circumstances (including financial and taxation issues) and seek professional advice from your stockbroker, accountant or other professional financial adviser before deciding to invest.

## SPECULATIVE INVESTMENT

The Securities offered pursuant to this Prospectus should be considered highly speculative. There is no guarantee that the Securities offered pursuant to this Prospectus will make a return on the capital invested, that dividends will be paid on the Shares or that there will be an increase in the value of the Securities in the future.

Prospective investors should carefully consider whether the Securities offered pursuant to this Prospectus are an appropriate investment for them in light of their personal circumstances, including their financial and taxation position. Refer to Section 5 for details relating to the key risks applicable to an investment in the Securities.

## DISCLAIMER

No person named in this Prospectus, nor any other person, guarantees the performance of the Company, the repayment of capital or the payment of a return on the Shares. No person is authorised to give any information or make any representation in connection with the Offer which is not contained in this Prospectus. Any information or representation not contained in the Prospectus may not be relied on as having been authorised by the Company or the Directors.

## PRIVACY

By filling out an Application Form to apply for Shares and Options, you are providing personal information to the Company through the Company's service provider, the Share Registry, which is contracted by the Company to manage Applications. The Company, and the Share Registry on its behalf, collect, hold and use that personal information in order to process your Application, service your needs as a Shareholder, provide facilities and services that you request and carry out appropriate administration.

If you do not provide the information requested in the Application Form, the Company and the Share Registry may not be able to process or accept your Application.

Your personal information may also be used from time to time to inform you about other products and services offered by the Company which it considers may be of interest to you. Please refer to Section 10.17 of this Prospectus for further information regarding Privacy.

## CONSOLIDATION

The Offers are subject to and conditional upon the Shareholders approving the Consolidation at the General Meeting. Please refer to the details of the Shareholder Approvals to be obtained at the General Meeting as set out in Section 2.2 of this Prospectus.

Unless stated otherwise, all references to Securities of the Company as set out in this Prospectus are on the basis that the Consolidation (for which approval is being sought at the General Meeting to be held on 29 January 2016) has occurred.

## NO COOLING OFF PERIOD

Applicants have no cooling off rights in relation to Securities for which they apply. This means that an Applicant is not permitted or entitled to withdraw its Application once submitted, other than in certain specified circumstances as detailed in the Corporations Act.

## GLOSSARY

Defined terms and abbreviations used in this Prospectus are detailed in the glossary of terms in Section 12.

## CONTACTS

If you require assistance to complete the Application Form, require additional copies of this Prospectus, or have any questions in relation to the Offers you should contact the Share Registry on +61 (0)8 9315 2333 (from within Australia) or +61 (0) 8 9315 2333 (from outside Australia for Australian residents temporarily overseas), or go to the Company's website at https://www.securitytransfer.com.au/.

If you are uncertain as to whether the Company is a suitable investment for you, you should seek professional advice from your accountant, stockbroker or other professional financial adviser



For personal use only

The following conclusions are drawn:

1. Global real money gaming growth is on a **steady upwards trajectory**.
2. **The US**, despite significant prohibition, remains **by far the largest gaming market in the world**.
3. Global gaming gross win reached **€364.0bn** in 2014 and will continue to grow at a **2.0% CAGR** from **2015 to 2020** to reach **€409.3bn** by the end of the decade.
4. The real money online gaming sector reached **€32.0bn** global gross win in 2014, growing at **8x the rate of its land-based equivalent** over the last 10 years, with no signs of this trend slowing down.
5. **750 million** people play social games worldwide, the majority (**24.5%**) aged over **46+ years**.
6. In the US, there are over **200 million players**, with 50% of social networking users and 34% of internet users playing social games.
7. '**Social casino**' is by far **the most popular form** of social gaming in the world.
8. Global social casino revenues were **€2.64bn** in 2014, and by 2019, will reach **€4.14bn GGR**, at a **CAGR of 7.8%**.
9. The US represents **the largest social casino market in the world**, with **€0.85bn** or **32%** of the global market in 2014.
10. Growth is expected to rise at a **CAGR of 16.0%**, so that by 2019, the US will have **over 50%** of the world's social casino market (**€2.07bn**).
11. '**Sweepstakes**' are a unique concept and not classed as gaming within the sector because they are **free to enter**.
12. If analysed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes gaming model could be as much as **$12.2bn** today, or **$82bn** over a 5-year period.
13. **Internet Sweepstakes Cafes** have evolved and proliferated across the US over the last 10 years, but are **equally as applicable** across many of the world's Top 30 gaming nations.
14. **Internet Sweepstakes Cafes** are reported to have turned over **$10bn (€9.4bn)** in 2015, with **over 5,000** now operating in **12 states**.

*H2 Copyright*

*No part of this report may be reproduced for any purpose whatsoever without prior permission from H2 Gambling Capital. H2 Gambling Capital owns the interactive gambling industry model that generates the industry values and forecasts referenced herein.*




For personal use only

## SECTION 3: US INTERNET SWEEPSTAKES GAMING

*'Sweepstakes' are a unique concept and not classed as gambling within the sector because they are free to enter.*

*If assessed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes model could be as much as $12.2bn today, or $82bn over a 5-year period.*

*Internet Sweepstakes Cafes provide a land-based example that has evolved and proliferated across the US over the last 10 years, but are equally as applicable across many of the world's Top 30 gaming nations.*

*Internet Sweepstakes Cafes are reported as turning over $10bn (€9.4bn) annually in 2015, with over 5,000 now operating in 12 states.*

### DEFINITION

65 'Sweepstakes' are a particular form of gaming in which all stakes in the game are offered at no charge to the participants, and its associated prizes are divided up amongst its winners. They are a unique concept within the sector as they are not classed legally as gambling or lotteries. They are instead considered a free to enter promotion in which a cash prize is awarded to its participants, even though this is won on the basis of chance, not skill.[6]

66 Sweepstakes are globally used as a form of trade promotion, but they have gained particular traction in the US recently, and are now considered a real market opportunity, as well as an innovative way of combining land-based and online gaming. Under US gambling law, if the sweepstakes participant can play a game for free (i.e. with no paid-in consideration), then it does not matter if the outcome is determined more by chance than skill, prizes can still be won. No-purchase-necessary sweepstakes have been common in the US since at least 1954, when the US Supreme Court ruled that the television game show *Name That Tune* was not a lottery, given contestants at home could enter by sending in a postcard. Sweepstakes do not involve 'consideration' because the player does not pay to enter, rather their entry is supplementary to a related purchase.

67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.

68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

### MARKET SIZE – GLOBAL V US

69 There is far less reported data on Internet Sweepstakes Gaming (Internet Sweepstakes Gaming or ISG) than any other form of gaming.

70 Sweepstakes are an established form of trade promotion in many of the more developed international economies, and while the US market has demonstrated the highest rate of adoption of the internet sweepstakes cafe business model, it is equally applicable across the majority of the world's top 30 gaming nations (see Fig 6 earlier).

---

6 *http://www.sweepstakeslaw.com/internet-sweepstakes.html*

### US Potential Activity

71 There is a significant opportunity for Internet Sweepstakes Gaming in the United States market. The size of the market opportunity could be estimated based on the total size of the US online real money gaming market (particularly casino, poker and lottery) if it was fully regulated and licensed across the US, as this, in comparative terms, ultimately represents the market (estimated below in US$) within which the internet sweepstakes cafe model presently operates.

72 Only $2.82bn (or 2.4%) of all US real money gaming was online in 2014. Although this number positions the United States as the 4th largest online gaming market in the world, H2 is confident that it does not represent anywhere near the present potential for onshore regulated online gaming in the US at this time. This is because the 3 states currently legalised (Delaware, Nevada and New Jersey) have all operated under significant open market constraints – including a lack of a critical mass of other states in the market (liquidity); limited acceptance of payment credit cards, and key restrictions on advertising (the lifeline of the online operator).

73 In considering both this and the 'potential' US activity nationwide, H2 believes it is conservative to focus on the 24 states in which land-based gaming is legal and regulated, namely: Nevada, South Dakota, Colorado, New Mexico, Kansas, Oklahoma, Iowa, Missouri, Illinois, Michigan, Indiana, Ohio, West Virginia, Louisiana, Mississippi, Florida, Pennsylvania, New York, Maryland, Delaware, New Jersey, Rhode Island, Massachusetts and Maine.

74 H2's has estimated the size of the market opportunity for Internet Sweepstakes Gaming in the US based on its estimate of the size of the online real money casino and poker gaming market, increasing to $9.3bn gross win within 1 year and reaching $14.4bn within 5 years, with a total of c$60bn over the first 5 years. For lottery, it would result in an additional $2.9bn within year 1, rising to $4.6bn by year 5, with a first 5 year total of c$22bn. H2 estimates a total US online real money gaming market size of $12.2bn today, $19.0bn in 2020 and a total amount of $82bn over the full five year period.

75 As it is difficult, to predict legislative movement at a US Federal level over the next 5 years, it is reasonable to develop a more realistic 'base case' estimate of the market size, somewhere in the realm of about half of the above estimates. H2 estimates this 'base case' could be achieved if just 8-10 key states, including the addition of the four states actively considering online regulation currently (i.e. California, Illinois, New York and Pennsylvania), which would get the estimation to c50% of the potential value. However this would be predicated on all 3 of the above issues being addressed, including the ability to pool liquidity and operate across states but be locally licensed (as is the case currently with US horse race betting).

### US Current Activity

76 In terms of current US market size, the American Gaming Association has estimated that there are presently 5,000 internet sweepstakes cafes operating in 12 states across the US.[7] Internet sweepstakes cafes are estimated to turnover $10bn (€9.4bn) annually in 2015[8].

7 *ASA 'Internet sweepstakes cafes: unregulated storefront gambling in the neighborhood' - https://www.americangaming.org/research/white-papers/internet-sweepstakes-cafes and http://www.latimes.com/local/lanow/la-me-ln-sweepstakes-games-20150625-story.html*

8 *ASA 'Internet sweepstakes cafes: unregulated storefront gambling in the neighborhood' - https://www.americangaming.org/rese-arch/white-papers/internet-sweepstakes-cafes and http://www.latimes.com/local/lanow/la-me-ln-sweepstakes-games-20150625-story.html*

For personal use only






For personal use only

## US MARKET OVERVIEW

77 In terms of regulation, US sweepstakes is governed at the federal level by:

- The Deceptive Mail Prevention and Enforcement Act (commonly known as the 'sweepstakes law') which applies to sweepstakes made available and promoted through direct mail. The Act is not relevant to online sweepstakes; and
- The Federal Trade Commission regulates sweepstakes by imposing certain conditions on sweepstakes rules, generally governing the information that must be disclosed to participants. The Commission also protects consumers from prize and sweepstakes scams.

78 Sweepstakes are also subject to regulation at the state level, including those that restrict them in regulated industries, those that require registration with the regulator and those that require certain information to be disclosed to participants. Appendix 2 provides a comprehensive but not exhaustive list of state by state laws currently relating to the offering of sweepstakes for reference purposes.

79 Internet sweepstakes generally specify the jurisdictions in which the draw is valid and a blank statement 'void where prohibited by law' to ensure compliance with the relevant jurisdiction.

80 The developing regulatory approach to Internet Sweepstakes Gaming and Internet Sweepstakes Cafes within the US, and the estimated market size and current level of activity, reflect the considerable commercial need for Sweepstakes Gaming at this time. The Sweepstakes Gaming segment is a source of significant gaming revenue in the US market and it is expected grow strongly with the emergence of Internet Sweepstakes Gaming.

## INTERNATIONAL MARKET OPPORTUNITY

81 Internet Sweepstakes Cafes have evolved and proliferated across the US over the last 10 years.

82 Sweepstakes are widespread trade promotion marketing techniques used across many of the world's Top 30 gaming nations.

83 Internet Sweepstakes Gaming may be equally applicable as a business model, subject to local legal compliance, across major international gaming markets.

For personal use only

## SUMMARY AND CONCLUSIONS

84 We conclude that in all 3 segments: real money gaming; social casino and internet sweepstakes – the US market remains strongly positioned, with considerable further growth over the next 5 years to the end of the decade.

85 We draw the following conclusions:

1 *Global real money gaming growth is on a steady upwards trajectory.*

2 *The US, despite significant prohibition, remains by far the largest gaming market in the world.*

3 *Global gaming gross win reached €364.0bn in 2014 and will continue to grow at a 2.0% CAGR from 2015 to 2020 to reach €409.3bn by the end of the decade.*

4 *The real money online gaming sector reached €32.0bn global gross win in 2014, growing at 8x the rate of its land-based equivalent over the last 10 years, with no signs of this trend slowing down.*

5 *750 million people play social games worldwide, the majority (24.5%) aged over 46+ years.*

6 *In the US, there are over 200 million players, with 50% of social networking users and 34% of internet users playing social games.*

7 *'Social casino' is by far the most popular form of social gaming in the world.*

8 *Global social casino revenues were €2.64bn in 2014, and by 2019, will reach €4.14bn GGR, at a CAGR of 7.8%.*

9 *The US represents the largest social casino market in the world, with €0.85bn or 32% of the global market in 2014.*

10 *Growth is expected to rise at a CAGR of 16.0%, so that by 2019, the US will have over 50% of the world's social casino market (€2.07bn).*

11 *'Sweepstakes' are a unique concept and not classed as gaming within the sector because they are free to enter.*

12 *If analysed against the potential value of the US real money online gaming if regulated, the actual market value for the sweepstakes gaming model could be as much as $12.2bn today, or $82bn over a 5-year period.*

13 *Internet Sweepstakes Cafes have evolved and proliferated across the US over the last 10 years, but are equally as applicable across many of the world's Top 30 gaming nations.*

14 *Internet Sweepstakes Cafes are reported to have turned over $10bn (€9.4bn) in 2015, with over 5,000 now operating in 12 states.*