# EXHIBIT "F"

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ADRIENNE BENSON AND MARY SIMONSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOUBLE DOWN INTERACTIVE, LLC, a Washington limited liability company, and INTERNATIONAL GAME TECHNOLOGY, a Nevada corporation, and IGT, a Nevada corporation.<br><br>*Defendants*. | Case No. 2:18-cv-00525-RSL<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Adrienne Benson and Mary Simonson ("Plaintiffs") bring this case, individually and on behalf of all others similarly situated, against Double Down Interactive, LLC ("Double Down") as well as International Game Technology and its subsidiary IGT (together "IGT") (altogether, collectively, "Defendants") to enjoin Defendants' operation of illegal online casino games. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigation conducted by their attorneys, as to all other matters.

## NATURE OF THE ACTION

1. Defendants own and operate video game development companies in the so-called "casual games" industry—that is, computer games designed to appeal to a mass audience of casual gamers. Defendants (at all relevant times) owned and operated a popular online casino under the name Double Down Casino.

2. Double Down Casino is available to play on Android, and Apple iOS devices, and on Facebook.

3. Defendants provide a bundle of free "chips" to first-time visitors of Double Down Casino that can be used to wager on games within Double Down Casino. After consumers inevitably lose their initial allotment of chips, Defendants attempt to sell them additional chips for real money. Without chips, consumers cannot play the gambling game.

4. Freshly topped off with additional chips, consumers wager to win more chips. The chips won by consumers playing Defendants' games of chance are identical to the chips that Defendants sell. Thus, by wagering chips that have been purchased for real money, consumers have the chance to win additional chips that they would otherwise have to purchase.

5. By operating the Double Down Casino, Defendants have violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Plaintiffs, on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

6. Plaintiff Adrienne Benson is a natural person and a citizen of the state of Washington.

7. Plaintiff Mary Simonson is a natural person and a citizen of the state of Washington.

8. Defendant Double Down Interactive, LLC is a limited liability company organized and existing under the laws of the State of Washington with its principal place of business at 605 Fifth Avenue South, Suite 300, Seattle, Washington 98104. Double Down

1 | conducts business throughout this District, Washington State, and the United States.

9. Defendant International Game Technology is a corporation existing and organized under the laws of the State of Nevada with its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113. International Game Technology conducts business throughout this District, Washington State, and the United States.

10. Defendant IGT, a subsidiary of International Game Technology, is a corporation existing and organized under the laws of the State of Nevada with its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113. IGT conducts business throughout this District, Washington State, and the United States. IGT conducts business throughout this District, Washington State, and the United States.

**JURISDICTION AND VENUE**

11. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from any Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

12. The Court has personal jurisdiction over Defendants because Defendants conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the evens giving rise to Plaintiffs' claims occurred in and emanated from this District.

**FACTUAL ALLEGATIONS**

**I.    Free-to-Play and the New Era of Online Gambling**

14. The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions" or "in-app purchases").

15. The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

16. With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some ... the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

17. Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

18. The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

---

[1] GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited Jul 23, 18)

[2] *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat*, https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Jul. 23, 18)

[3] PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 5, 2018).

[4] The Badger, *Are micro-transactions ruining video games? | The Badger*, http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited Apr. 5, 2018).

[5] *Id.* (emphasis added).

19. Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

20. Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."

…

> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

21. The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to

---

[6] Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 5, 2018)

[7] Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

22. The similarity between micro-transaction games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants' online casino games have thrived and thousands of consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of chance.

## II.   A Brief Introduction to Double Down and IGT

23. Double Down is a leading game developer with an extensive library of free-to-play online casino games. Double Down sells in-app chips to consumers in the Double Down Casino so that consumers can play various online casino games in Double Down Casino.

24. IGT is a global leader in the gaming industry with long ties to the traditional casino market. It has developed a multitude of casino and lottery games, including traditional slot machines and video lottery terminals. In 2012, IGT acquired Double Down and its library of online casino games, and has since "grown into one of the largest and most successful brands in the North American social casino market."[10]

25. In 2017, IGT sold Double Down for $825 million to DoubleU Games.[11] In addition to the sale, IGT has also entered into a long-term game development and distribution

---

[8] *Id.* (emphasis added).
[9] In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendants', by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204 htm (last visited Apr. 5, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*
[10] *IGT To Sell Online Casino Unit DoubleDown To South Korean Firm For $825 Million - Poker News*, https://www.cardplayer.com/poker-news/21554-igt-to-sell-online-casino-unit-doubledown-to-south-korean-firm-for-825-million (last visited Ap. 6, 2018).
[11] *Id.*

SECOND AMENDED COMPLAINT
Case No. 2:18-cv-00525-RSL

- 6 -

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312 589 6370 • Fax: 312 589 6378